Filed 7/7/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br><br>NATHAN CHRISTIAN WANDREY,<br><br>    Defendant and Appellant. | A161691<br><br>(Sonoma County<br>Super. Ct. No. SCR7209161) |

Nathan Christian Wandrey was convicted of numerous counts of sex offenses committed against the daughter of his then-girlfriend, and sentenced to consecutive aggravated prison terms totaling 756 years. Several of his arguments on appeal arise from the fact that he was charged with and prosecuted for numerous separate but undifferentiated offenses after being held to answer on a single count of continuous sexual abuse of a child and single count of committing a lewd and lascivious act on a child. Wandrey additionally argues the victim's generic testimony was insufficient to support the verdicts; the trial court's requirement that witnesses wear masks covering their noses and mouths violated his constitutional right to confrontation; and the trial court erred in failing to conduct an in camera review of subpoenaed documents and in its instructions to the jury. He also raises several claims of sentencing error. We find the challenges to the

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I through IV.

1

convictions meritless and reject the challenges to consecutive sentencing. We agree, however, that remand for resentencing is required due to postsentencing statutory amendments affecting the imposition of upper terms.

## STATEMENT OF THE CASE

A complaint filed on October 12, 2018, charged Wandrey with one count of continuous sexual abuse (Pen. Code, § 288.5, subd. (a))[1] in a three-year period from April 2012 to April 2015, with a substantial sexual conduct enhancement (§ 1203.066, subd. (a)(8)); one count of committing a lewd act upon a minor (§ 288, subds. (a) & (c)(1)) between April 2015 and April 2017; and one count of contacting a minor with intent to commit a sexual offense (§ 288.3, subd. (a)) between April 2016 and April 2017. Following a preliminary hearing, Wandrey was held to answer on the first two counts; the court found insufficient evidence to support the third count.

On July 9, 2019, an information was filed charging Wandrey with 272 counts, the odd numbered counts alleging assault with intent to commit a sexual offense against a victim under 18 years of age (§ 220, subd. (a)(2)), alternating with even numbered counts alleging commission of lewd acts upon a child (§ 288, subds. (a) & (c)(1)). The offenses were alleged to have been committed in four specified time periods: April 2012 to April 2013 (counts 1–48), April 2013 to April 2014 (counts 49–96), April 2014 to April 2015 (counts 97–220), and April 2015 to April 2016 (counts 221–272).

The trial court overruled Wandrey's demurrer. The trial court also denied Wandrey's subsequent motion to dismiss (§ 995) as to all counts through 220; as to counts 221 through 272, the trial court granted the motion

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

2

to dismiss all the counts alleging violations of section 288, subdivision (c)(1),[2] and all but 10 of the counts alleging sexual assault.

The first amended information, filed March 18, 2020, alleged a total of 230 counts. Counts 1 through 220 alternately alleged assault with intent to commit a sex offense against a victim under 18 years of age (odd numbered counts) and commission of lewd acts upon a child (even numbered counts) committed as follows: On or between April 2012 and April 2013 (counts 1–48); on or between April 2013 and April 2014 (counts 49–96); and on or between April 2014 and April 2015 (counts 97–220). Certain of the counts alleging commission of lewd acts further alleged that Wandrey engaged in substantial sexual contact while committing the offense (§ 1203.066, subd. (a)(8)) (even numbered counts 26–48, 74–96, 122–220).

Counts 221 to 230 alleged assault with intent to commit a sex offense against a victim under 18 years of age on or between April 2015 and April 2016.

Wandrey pleaded not guilty and denied the special allegations.

During trial, the court granted the prosecutor's motion to dismiss counts 1 through 48.

On November 16, 2020, the jury found Wandrey guilty on counts 49 through 72 and 97 through 230, and found true the enhancement allegations in the even numbered counts from 122 through 220. The jury deadlocked on counts 73 through 96. The trial court declared a mistrial as to these counts and subsequently dismissed them on the prosecutor's motion.

---

[2] The motion to dismiss was granted as to the counts alleging violations of section 288, subdivision (c)(1), because that offense requires that the defendant be 10 years older than the victim and no evidence of Wandrey's age was presented at the preliminary hearing.

On December 4, 2020, the trial court denied Wandrey's posttrial motion to dismiss counts 49 through 72, and sentenced him to an aggregate term of 756 years in prison.

## STATEMENT OF FACTS

Jane Doe, born in April 2001, was 19 years old at the time of trial. She testified that she was "very stressed" being in court; it was hard to talk about what had happened and "incredibly hard" to be in court because, "I have to be so close to the source of my trauma in the same room." Memories from her childhood were "on [her] mind all the time" and "really intrusive."

Doe testified that her mother began dating Wandrey when Doe was about nine years old. Doe came to think of Wandrey as a father figure because he paid attention to her, fed her and taught her things like cooking and personal hygiene that her mother, whom Doe described as mentally unstable, had not taught her. Doe was closer with Wandrey than she was with her mother: He treated her as a person instead of a baby, as her mother did, spent more time with her, and gave her more attention.

As Doe got older, Wandrey would ask her about changes in her body. When she was around 10 years old, he asked how large her nipples were, which at the time Doe thought was "weird." She testified this was the first time she "vividly remember[ed]" him being sexual with her, but "it was just verbal."

Doe, her mother, and Wandrey moved from Santa Rosa to a new neighborhood when Doe was in sixth grade, 11 or 12 years old.[3] Doe's mother

---

[3] Doe initially recalled the move being around the end of sixth grade, so estimated she was "maybe 10" years old. After referring to charts showing her age and the school grades she was in for each year of her life, she testified that she would have been 11 and 12 years old in sixth grade and that she

became "very bitter"; she and Wandrey started arguing more and spending less time together. Wandrey spent more time with Doe and began to be "more physical" with her when her mother was not nearby. Starting around the second or third month after the move, Wandrey would have Doe sit on his lap while she played computer games; when she sat on his knees, he would tell her it was okay to "scoot back" and sometimes pull her back with his hands. This made her uncomfortable, but she tried to ignore it. Around a month later, Wandrey began to give her "what he called massages," which started at Doe's shoulders and "would evolve to underneath my shirt on my breasts." Doe described a time when she was sitting at the piano bench and Wandrey started to massage her this way, inhaling loudly every so often. He told her the massages were "normal" and "natural" and she believed him because she trusted him. The massages happened "[m]any times." During the first year after the move, when Doe was 12 years old, Wandrey would touch her chest "[p]robably three times a week," but "[i]t could have been less or more." There would be weeks when it did not happen at all, as Wandrey sometimes stayed at his own home and went to Hawaii for a month or two each year to see his family. Doe agreed with the prosecutor's suggestion that the three times per week she estimated would amount to approximately 150 times that year and testified that Wandrey "definitely" touched her chest "at least 12 times" that year.

Doe testified that the chest touching "evolved" into Wandrey coming into her room and touching her vagina.[4] He would "start over my underwear

_____

thought the move was before her twelfth birthday (i.e., in Apr. 2013), but was not sure.

[4] On cross-examination, Doe initially testified that she was sure the vaginal touching was happening when she was in eighth grade (when she was 13 to 14 years old), and thought it began in seventh grade (when she was

5

by rubbing the top part of my vagina and then he would continue under my underwear and he would put his fingers inside of my vagina repeatedly." Sometimes Wandrey would touch her legs or "butt" or back, but he would then move to her vagina. Doe would sometimes try to "squirm away," but usually she "would just freeze," feeling there was nothing she could do. She felt "just completely overpowered" because she knew he exercised frequently and practiced martial arts, and she started to become afraid she might get hurt if she did not let him do what he wanted.

Asked if she remembered every time Wandrey touched her in the way she was describing, Doe testified, "They happened so frequently that a lot of them just blur together." Wandrey would sometimes touch both her chest and her vagina in one incident, but usually it was one or the other. Once it started, the vagina touching became much more frequent than the chest touching. Doe testified that "[i]t felt like it happened every day to me" and estimated that Wandrey touched her vagina at least 100 times during the year she was 12. This was an approximation, but he "definitely" touched her vagina "at least 12 times" that year.

The "massages" continued when Doe was 13 years old. She blocked them from her mind; when she tried to think about it, it would be "really confusing because I trusted him so much and I didn't want to think that what he was doing was wrong." She estimated that Wandrey touched her chest "[m]aybe once a week" when she was 13, but "definitely" at least 12 times. He touched her vagina three or four times a week: "[W]henever he was home it would happen." This estimate would mean Wandrey touched Doe's vagina

---

12 to 13 years old), but had trouble remembering at what point in seventh grade it started. She then testified that she knew it happened in seventh grade and it "could have been" the beginning or middle of that school year.

approximately 152 to 208 times the year she was 13.  Doe testified he "definitely" touched her vagina at least 50 times that year.

When Doe was 14, the touching continued and Wandrey started giving her very strong alcoholic drinks, almost always at night before bed.  She liked the feeling of being drunk and would fall asleep easily.  That year, Wandrey continued to touch Doe's chest, but not as frequently; he continued to touch her vagina "very frequently," every time he was home.  She estimated it was more like four times a week than three, and "definitely" at least 10 times that year.

Asked if, after she moved to the new neighborhood and started seventh grade, there were days when she saw Wandrey and he did not touch her in a sexual way, Doe responded, "occasionally."  It was hard for Doe to remember "exactly" how many times the sexual touching happened because "it was so frequent" and, because the incidents were all "very similar," they would "blur together."

At some point, Doe realized what Wandrey was doing was wrong, but before that she just felt "deeply uncomfortable."  When she realized, she did not tell anyone because she "cared about him like as a father" and did not want him to get in trouble.  When Doe was 14, she found a boyfriend she trusted and told him what was happening with Wandrey; he told her this was not normal or okay, and this "snapped me out of blocking it out."  She told Wandrey to stop a few times, but she was still scared to do this; he would "give me a break" for a few days but then start again.  Doe testified that it "took alcohol to give [her] the courage to tell him to stop":  On a trip to Hawaii the year she was 14, after Wandrey gave her a lot of alcohol and marijuana and she was so intoxicated she could "barely walk," she "wholeheartedly" told him to stop touching her.  He showed her his penis,

7

said, "just one more time" and continued to touch her vagina. After the trip, Wandrey did not touch Doe for about two weeks, then started touching her vagina again. She felt like there was nothing she could do about it.

The touching stopped when Doe was 15 and her mother and Wandrey broke up. The molestation was later reported to law enforcement after Doe disclosed it to a therapist and eventually to her mother. The therapist testified that Doe disclosed the sexual abuse at their first session and he reported it approximately a year later, in October 2018, when Doe let him know she was ready.

In October 2018, a detective arranged for Doe to make a pretext call to Wandrey to try to elicit an admission of the conduct. A recording of the call was played for the jury.

During the call, Wandrey resisted some of Doe's accusations, but also made statements that could be understood as tacit admissions. For example, when Doe told Wandrey, "I told you, remember, I always told you to stop," he said, "And I did." She said, "But you didn't," and he replied, "Mmm. Well, then there it is." After Wandrey told Doe he was "never anything but kind" to her, she said, "Kind isn't putting your fingers inside me, ok?" Wandrey responded, "Look, it doesn't-, it-, it-, all of-, any of this needed was an accusation and my life is done. That's it. Like . . . okay. So, you know, I'm not gonna talk about any of that stuff. I don't-, it's just not real. Wandrey said, "I'm just not gonna go there," when Doe asked, "you know putting fingers in my vagina was wrong. Right?" Then, when she told him, "you know you did it" and "[i]t happened like every day," he said, "Every day? What? . . . I don't remember molesting you every day. That's for sure." He asked, "What punishment do you think for me?" And when Doe said, "[a]ll I can remember is you fingering me," Wandrey replied, "Really, that's all you

8

can remember about our entire journey together?  That's all you can remember?"

Wandrey repeatedly indicated he would kill himself, saying this was all he could do for Doe because "[a]nything else would be ruining so many other lives."  At one point, when Doe told Wandrey she wanted an apology, he asked, "for what?"  He said he would not apologize "[b]ecause I don't believe that I screwed you up.  I think your mom did."  Later, when Doe said she wanted an apology for Wandrey "fingering" her, he said, "Mmm.  No.  No. . . . I'm not dropping that bomb on the world.  I'm just not doing it.  That would affect so many more than just us.  It's not-, not even something I'm willing to contemplate."  And later, "I did apologize to you.  I can only apologize to you so much.  I mean, holy moly, are you kidding me? . . .  I'm willing to sacrifice my life.  Was that clear enough? . . .  I'm not willing to-, I'm not willing to involve everyone else who's gonna be involved in what you want. . . ."

In addition to Doe's testimony and brief testimony from her therapist and the police detective, the prosecution presented expert testimony on child sexual abuse and child sexual abuse accommodation syndrome.  The defense did not present evidence.

## DISCUSSION

### I.

### *Wandrey's Rights Were Not Violated by the Manner in Which He Was Charged and Prosecuted*

Wandrey raises several issues concerning the manner in which he was charged and prosecuted, challenging the filing of a 272–count information after he was held to answer on two charges, the grouping of multiple identical charges into year-long periods, the use of generic testimony and approximations to support those charges and the references to year-long

9

groupings of charges in jury unanimity instructions.  As we will explain, none of these arguments have merit.

## A.

### *The Trial Court Properly Denied Wandrey's Demurrer*

Wandrey contends the trial court should have sustained his demurrer to the original 272-count information because it failed to provide sufficient notice to enable him to defend against specific offenses.  As indicated above, the original information charged 136 assaults with intent to commit a sex offense (§ 220, subd. (a)(2)) and 136 lewd acts (§§ 288, subd. (a) [counts 1–220] or subd. (c)(1) [counts 221–272]):  24 of each committed during the year Doe was 11 years old (Apr. 2012–Apr. 2013), 24 of each committed when she was 12 years old (Apr. 2013–Apr. 2014), 62 of each committed when she was 13 years old (Apr. 2014–Apr. 2015), and 52 of each committed when she was 14 years old (Apr. 2015–Apr. 2016).  As the prosecutor later explained in describing to the jury the organization of the charges in the first amended complaint, the information was structured to charge two offenses, one assault and one lewd act, for each act Wandrey was alleged to have committed:  Each pair of counts, an odd numbered count alleging assault followed by an even numbered count alleging commission of a lewd act, thus referred to a single incident of the touching Doe described.

Wandrey maintains that because he had been held to answer on two charges with a total maximum sentence exposure of 19 years, the 272-count information, exposing him to hundreds of years in prison, violated his due process right not to be taken by surprise by the evidence offered at trial.[5]

_____

[5] Wandrey was held to answer on one count of continuous sexual abuse of a child, for which the upper term is 16 years (§ 288.5, subd. (a)), and one count of lewd conduct on a 14 or 15 year old by a person at least 10 years

10

Wandrey argues the charging of numerous identical offenses in year-long time periods precluded him from defending against individual counts and precluded jurors from identifying specific acts if they failed to agree he committed all the acts charged.

A demurrer challenges the legal sufficiency of a pleading. (*People v. Biane* (2013) 58 Cal.4th 381, 388.) "It is limited to those defects appearing on the face of the accusatory pleading, and raises only issues of law. (Pen. Code, § 1004; *Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1090.)" (*Ibid.*) On appeal, we review an order overruling a demurrer de novo. (*People v. Perlas* (2020) 47 Cal.App.5th 826, 832.)

"Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them." (*People v. Seaton* (2001) 26 Cal.4th 598, 640.) Due process requires that an accused "not be taken by surprise by evidence offered against him at trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317 (*Jones*).) But "[a]n information which charges a criminal defendant with multiple counts of the same offense does not violate due process so long as (1) the information informs defendant of the nature of the conduct with which he is accused and (2) the evidence presented at the preliminary hearing informs him of the particulars of the offenses which the prosecution may prove at trial. . . . [Citations.] . . . [Citation.] So long as the evidence presented at the preliminary hearing supports the number of offenses charged against defendant and covers the timeframe(s) charged in

---

older than the child, for which the upper term is three years (§ 288, subd. (c)(1)).

11

the information, a defendant has all the notice the Constitution requires." (*People v. Jeff* (1988) 204 Cal.App.3d 309, 341–342.)

Doe's testimony at the preliminary hearing about the circumstances and nature of the molestation was similar to, albeit less detailed than, her trial testimony described above. Doe testified that the molestation began after the move to the new neighborhood; that it started with Doe sitting on Wandrey's lap and "progressed from there"; that Wandrey would touch her breasts over and then under her clothing in what he called "massages"; that the breast touching began before the genital touching; that the genital touching would start with Wandrey rubbing the "top part" of her vagina, after which he would "enter it with his fingers"; that Wandrey spent more time at her home, and the frequency of the molestation increased as she got older; and that the molestation was most frequent, and "became less focused about my breasts and more focused about my genitals," when she was 13 and 14 years old. Doe testified that as she got older, Wandrey would come over "every other day" and "any time he was over, it would end up happening." She explained, "It seemed very much like every time. I can't recall exactly every day but I believe it was almost every time. . . . It was so frequent it became just a numb part of my life, and I didn't want to keep track of it. I tried not to think about it. It is hard to remember because I spent so much time trying to forget about it."[6] Doe testified at the preliminary hearing that

---

[6] The primary difference from the trial testimony was that at the preliminary hearing Doe testified that the molestation began when she was 10 years old, and that Wandrey touched her breasts and her vagina at least 12 times each when she was 11 years old.

As earlier noted, counts 1 to 48, which alleged offenses committed between April 2012 and April 2013, when Doe was 11 years old, were dismissed at trial because the evidence indicated the earliest acts occurred when Doe was 12.

Wandrey touched her breasts at least 12 times and her vagina at least 12 times the year she was 12 years old; touched her breasts at least 12 times and her vagina at least 50 times when she was 13; and touched her breasts at least 13 times and her vagina at least 13 times the year she was 14 (for each, at least three times before her trip to Hawaii with Wandrey and at least 10 times after the trip).

*Jones, supra,* 51 Cal.3d at pages 313–314, held that "generic testimony" can provide substantial evidence of molestation. *Jones* explained that "even generic testimony (e.g., an act of intercourse 'once a month for three years') outlines a series of *specific,* albeit undifferentiated, incidents *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*Id.* at p. 314.) The victim "must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (*Id.* at p. 316.)

13

Doe's testimony satisfied these requirements: She described the kind of acts Wandrey committed and testified that in each of the time periods specified in the information, Wandrey committed at least the number of acts charged for that time period.

Although there was, in the words of the trial court, an "incredible difference between what was originally charged" and the 272 counts in the original information, Wandrey's claim of unfair surprise is not persuasive. An information "may charge the defendant with either the offense or offenses named in the order of commitment or any offense or offenses shown by the evidence taken before the magistrate to have been committed." (§ 739.) Conversely, "a defendant may not be prosecuted for an offense not shown by the evidence at the preliminary hearing or arising out of the transaction upon which the commitment was based." (*People v. Burnett* (1999) 71 Cal.App.4th 151, 165–166.) Wandrey may have been surprised at the number of counts charged in the information, but the charges of assault with intent to commit a sex crime and lewd conduct with a child certainly were shown by the evidence at the preliminary hearing and arose from the "transaction" the commitment was based upon.[7]

---

[7] Additionally, it appears the prosecutor informed defense counsel that the information would allege distinct offenses rather than a count of continuous sexual abuse if Doe's preliminary hearing testimony supported doing so. The prosecutor represented to the trial court that the defense had been given notice "that this would likely be the way the charging document looked moving forward if the case did not resolve prior to the preliminary hearing." When defense counsel protested that there was no notice the number of counts would "go from three to 272," and the discussion was simply that "things could get worse" if the matter did not resolve before the preliminary hearing, the prosecutor insisted there had been more than a vague assertion that things could get worse: "What the People indicated was that the charging was based on the victim not identifying specific incidents, and that is what led to the 288.5. But the victim did indicate that what

Wandrey's argument that he was unable to defend against the charges is also unpersuasive. Wandrey asserts that the broad year-long time periods alleged in the information precluded him from presenting evidence, such as alibi, to show he did not or could not have committed a given act. *Jones* rejected this sort of argument. "[O]nly infrequently can an alibi or identity defense be raised in resident child molester cases. Usually, the trial centers on a basic credibility issue—the victim testifies to a long series of molestations and the defendant denies that any wrongful touchings occurred. [Citations.] . . . [I]f the defendant has lived with the victim for an extensive, uninterrupted period and therefore had continuous access to the victim, neither alibi nor wrongful identification is likely to be an available defense. [Citation.] [¶] Even when an alibi defense is tendered, there is no reason why the jury would be less inclined to credit the defense as applied to appropriate counts, merely because the victim's generic testimony has implicated the defendant in additional counts or offenses not challenged by the alibi. Indeed, the fact that the defendant has established an alibi covering some of the time periods alleged in the information could significantly undermine the victim's testimony as to the remaining counts." (*Jones*, *supra*, 51 Cal.3d at p. 319.)

So it was in the present case: Doe testified that Wandrey committed a specified number of offenses in each of three one-year periods, and the defense attempted to undermine her testimony as to that number, in part by pointing to times Wandrey could not have engaged in the alleged conduct. Doe acknowledged that there were times Wandrey stayed at his own

happened, happened almost every day. And based on that indication, what the People alerted the defense to was if the victim described the preliminary hearing circumstances along those lines and were able to proceed with individual counts based on that, that is how the Information would look."

15

residence rather than her mother's, and that he went to Hawaii for a month or two each year. In closing argument, defense counsel argued that Wandrey's trips to Hawaii, as well as times Doe and her mother went to Hawaii with him,[8] reduced Wandrey's opportunities to molest Doe, resulting in insufficient evidence as to the number of times abuse occurred. In particular, defense counsel argued there was insufficient evidence to support the counts alleging offenses during the year Doe was 12, as Doe's time estimates indicated the first sexual touching did not take place until midway through that year and the time in which offenses could have occurred was further reduced by the Hawaii trips and the uncertain number of times Wandrey was with Doe, but did not touch her in a sexual manner. The information did not deprive Wandrey of his right to present a defense: He was able to, and did, attempt to undermine Doe's credibility as to whether the offenses occurred at all and, if so, as to their number.

Wandrey also insists his demurrer should have been granted because the information, by charging multiple offenses in identical language within each year-long period, gave the jurors no means to choose one count over another if they did not agree on the number committed.

" 'In a criminal case, a jury verdict must be unanimous. [Citations.]' (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) 'Additionally, the jury must agree unanimously the defendant is guilty of a specific crime.' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 555.) *Jones* rejected "the contention that jury unanimity is necessarily unattainable where testimony regarding repeated identical offenses is presented in child molestation cases. In such cases, although the jury may not be able to readily distinguish between the

---

[8] Doe testified that she and her mother went to Hawaii with Wandrey two or three times.

16

various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." (*Jones*, *supra*, 51 Cal.3d at p. 321.)

Wandrey acknowledges that generic testimony may assure unanimity where the victim testifies that the alleged conduct took place at least as many times as charged and the jury believes the testimony in toto; in that situation, the jury's "difficulty in differentiating between the various acts should not preclude a conviction of the . . . counts charged, so long as there is no possibility of jury disagreement regarding the defendant's commission of any of these acts." (*Jones*, *supra*, 51 Cal.3d at p. 321.) Wandrey argues, however, that apparent unanimity could not be assured by the information charging of hundreds of identical counts in the present case because the jury in fact deadlocked on half of the "identically-charged" counts for the 2013 to 2014 time period, finding him guilty on counts 49 to 72, but deadlocking on counts 73 to 96.

The significance Wandrey attaches to the jury's deadlock is misplaced because the charges in counts 73 to 96 were *not* identical to the offenses charged in counts 49 to 72, and it is clear the jury agreed unanimously on the acts underlying the counts of which Wandrey was convicted. Identical language was used in alleging each of the assaults in odd numbered counts 49 to 95 and identical language was used in alleging each of the lewd acts in even numbered counts 50 to 96. But the lewd act counts in the group on which the jury deadlocked (74–96) differed from lewd act counts in the group on which it convicted (50–72) in that the former each included an allegation that Wandrey engaged in substantial sexual conduct in committing the offense. The prosecutor explained to the jury in closing argument at trial that these enhancement allegations made clear that the lewd acts alleged in

even numbered counts 74 to 96 were incidents in which Wandrey touched Doe's vagina, while even numbered counts 50 to 72, which did not include such enhancement allegations, referred to the incidents in which Wandrey touched Doe's chest.  Thus, the jury found Wandrey guilty of *all* the acts of chest touching alleged to have occurred during the year Doe was 12 years old and deadlocked on all the counts alleging Wandrey touched Doe's vagina that year.

The trial court did not err in overruling Wandrey's demurrer.

## B.

### *The Trial Court Did Not Err in Denying the Motion to Dismiss as to Counts 1 Through 220*

Wandrey argues the trial court erred in failing to grant his motion to dismiss the original information (§ 995) because the information changed the time periods of the charged offenses and went "far beyond" the evidence presented at the preliminary hearing, thereby denying him the right to be informed of the charges against him and the right to proceedings before a magistrate to confer jurisdiction upon the trial court.

The California Constitution "requires that 'one may not be prosecuted in the absence of a prior determination of a magistrate or grand jury that such action is justified.' " (*People v. Burnett*, *supra*, 71 Cal.App.4th at p. 165, quoting *Jones v. Superior Court* (1971) 4 Cal.3d 660, 666; Cal. Const. art. 1, § 14.)  Accordingly, " ' "[a]n information which charges the commission of an offense not named in the commitment order will not be upheld unless (1) the evidence before the magistrate shows that such offense was committed [citation], and (2) that the offense 'arose out of the transaction which was the basis for the commitment' on a related offense.  [Citations.]" ' (*People v. Pitts* (1990) 223 Cal.App.3d 606, 903, quoting *Jones v. Superior Court*[, *supra*, at pp.] 664–665.)" (*Burnett*, at p. 165.)

" 'We will not set aside an information "if there is some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." ' (*People v. San Nicolas* (2004) 34 Cal.4th 614, 654, quoting *People v. Hall* (1971) 3 Cal.3d 992, 996." (*People v. Scully* (2021) 11 Cal.5th 542, 582.) " ' "[E]very legitimate inference that may be drawn by the reviewing court from the evidence must be drawn in favor of the information." ' (*People v. Williams* (1988) 44 Cal.3d 883, 924–925.)" (*Banerjee v. Superior Court* (2021) 69 Cal.App.5th 1093, 1111.)

The complaint charged, and Wandrey was held to answer for, a single count of continuous sexual abuse (§ 288.5) committed over a three-year period (Apr. 2012–Apr. 2015), with an allegation of substantial sexual conduct (§ 1203.066, subd. (a)(8)), and a single count of committing a lewd act upon a minor (§ 288, subds. (a) & (c)(1)) between April 2015 and April 2017. In Wandrey's view, while the evidence at the preliminary hearing gave notice of the acts necessary to substantiate a charge of continuous sexual abuse, "the 220 counts that survived the Section 995 motion were a substantial variance from the charges presented at the preliminary hearing and complaint."

*People v. Pitts*, *supra*, 223 Cal.App.3d 606 (*Pitts*), upon which Wandrey relies, presented a very different situation from the one here. In that case*,* seven adults were charged with committing numerous lewd acts in violation of section 288, subdivision (b), within a two-year period, some counts specifying a particular sexual act and others leaving the act unspecified.[9] (*Pitts*, at pp. 634, 894–897.) Multiple counts were amended during trial and, for some, "the specific act and/or actors changed from previous amendments,

---

[9] The defendants were also charged with conspiracy, use of children for pornography, child endangerment, and assault. (*Pitts*, *supra*, 223 Cal.App.3d at pp. 634, 894–897.)

19

and/or the specific act involving specific actors was not shown by evidence adduced at a particular preliminary hearing."[10] (*Id.* at pp. 897–900, 902, 907.) Rejecting the argument that due process was satisfied because "defendants were on notice to defend against any and all lewd acts involving any child shown by preliminary hearing evidence to have been present during the molestations," *Pitts* stated, "To hold such variances are immaterial, however, would be to hold that due process is satisfied as long as the preliminary hearing evidence shows five violations of a statute and the evidence at trial shows the same number of violations of the same statute, regardless of the particulars." (*Id.* at p. 907.) Accordingly, *Pitts* reversed convictions on counts for which the specific act (e.g., "Christine touched Johnny's penis") was not shown by the evidence at the preliminary hearing for that defendant.[11] (*Id.* at pp. 907–914.)

The present case does not involve any such confusion of particulars. Wandrey was charged with committing two specific types of acts—touching Doe's breasts and touching her vagina, with digital penetration—against a single victim. The complaint charged a single count of continuous sexual

---

[10] A single child victim was the only witness for the prosecution at three separate preliminary hearings, two for two different groups of three defendants and one for an additional defendant. (*Pitts*, *supra*, 223 Cal.App.3d at p. 893.) Seven children testified for the prosecution at trial and two for the defense. (*Id.* at pp. 645–678.)

[11] By way of illustration, one of the reversed counts for defendant Forsythe, alleged that "Johnny put his penis to Clovette's genitals." Rejecting the Attorney General's argument that the count was supported by Johnny's testimony that he had to put his penis in Clovette's vagina, the court explained that testimony was given at the preliminary hearing for other defendants; at Forsythe's preliminary hearing, "the only specific act testified to involving Clovette was when Tommy stuck his penis in Clovette's vagina." (*Pitts*, *supra*, 223 Cal.App.3d at p. 913.)

20

abuse over a three-year period (Apr. 2012–Apr. 2015) and a single count of committing a lewd act within a two-year period (Apr. 2015–Apr. 2017); the information alleged hundreds of individual counts based on the number of times Doe testified Wandrey touched her breasts and the number of times he touched her vagina in each of four year-long time periods (Apr. 2012–Apr. 2013; Apr. 2013–Apr. 2014; Apr. 2014–Apr. 2015; Apr. 2015–Apr. 2016). Despite the magnitude of change in number of counts, each count was supported by Doe's testimony at the preliminary hearing.  Accordingly, there was at least " ' "some rational ground for assuming the possibility" ' " that Wandrey committed the charged offenses.  (*People v. Scully*, *supra*, 11 Cal.5th at p. 582.)

## C.

### *The Convictions Were Supported by Substantial Evidence*

Wandrey argues Doe's generic testimony was insufficient to support his convictions, as he did below in his motions for a judgment of acquittal (§ 1118.1) and for a new trial.  In essence, his argument is that the testimony was insufficiently specific to support the 158 counts of which he was convicted.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Lewis* (2009) 46 Cal.4th 1255, 1289–1290.)  "We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  (*People v. Ramirez* (2006) 39 Cal.4th 398, 463.)  If the

21

circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Valdez* [(2004)] 32 Cal.4th [73,] 104.) A reviewing court neither reweighs evidence nor reevaluates a witness's credibility. (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.)" (*Lindberg*, at p. 27.)

Wandrey recognizes that, as earlier described, generic testimony "outlines a series of *specific*, albeit undifferentiated, incidents, *each* of which amounts to a separate offense, and *each* of which could support a separate criminal sanction." (*Jones, supra*, 51 Cal.3d at p. 314.) " 'A young victim . . . , assertedly molested over a substantial period by a parent or other adult residing in his home, may have no practical way of recollecting, reconstructing, distinguishing or identifying by "specific incidents or dates" all or even any such incidents. (*Indeed, even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance.*)' " (*People v. Matute* (2002) 103 Cal.App.4th 1437, 1445 (*Matute*), quoting *Jones*, at p. 305.)

As we have said, Doe's testimony satisfied the requirements *Jones* imposed for generic testimony concerning continuous abuse. She described "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g. lewd conduct, intercourse, oral copulation or sodomy)" (*Jones, supra,* 51 Cal.3d at p. 316): Wandrey touched her breasts both over and under her clothing and, increasingly as she got older, touched her vagina by first rubbing the "top part" and then putting his fingers inside her vagina; the breast touching began with incidents when Doe was sitting on Wandrey's lap playing computer games and also happened

22

when she was sitting on the piano bench and at the dinner table, but happened most frequently in her bedroom. Doe described "*the number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')" (*ibid*): She testified that Wandrey "definitely" touched her breasts and her vagina in the manner she described "at least" the number of times alleged, although she believed the acts occurred far more frequently. And she described "*the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period" (*ibid*.): She tied the beginning of the molestation to her move to a new neighborhood, which took place when she was in sixth grade and was 12 or 13 years old and stated the minimum number of times each act occurred for each of the years at issue.

Wandrey attempts to demonstrate the insufficiency of Doe's testimony by distinguishing the present case from *Jones*, emphasizing that the child in that case described six acts occurring in four different rooms of the house and on camping trips, and "*Jones* did not divide again a 3-year time period into three separate one-year time periods with multiple, identically-charged counts therein, or extrapolate the particular acts described into literally hundreds of charges based upon a speculative multiplier." Similarly, Wandrey contrasts presenting the jury with "220 counts spread across 4 one-year periods" with the presentation of "15 monthly counts" in *Matute*.

These distinctions are not meaningful for purposes of determining the sufficiency of Doe's testimony. Doe described two specific types of abuse occurring with great frequency, most often in her bedroom, but also in other parts of the house, over the three years before her mother and Wandrey

ended their relationship. Her inability to differentiate each act of breast or vaginal touching from others of the same type in terms of specific time and place is not surprising in light of the frequency and duration of the abuse, especially as Doe was testifying several years after the fact about experiences that she had actively tried to block from her mind at the time and continued to cause her great distress. Her testimony was sufficient to establish that Wandrey assaulted her with intent to commit a sexual offense, and committed lewd acts against her, on at least the number of occasions, and within the time frames, alleged in the counts for which he was convicted.

Neither *Jones* nor *Matute* precludes charges grouped into a year-long time frame; in fact, contrary to Wandrey's characterization, the 15 counts in *Matute* were all alleged to have been committed during the same 15-month period. (*Matute*, *supra*, 103 Cal.App.4th at p. 1440.) Nor do these cases preclude charges grouped in time periods based on a victim's age. As Wandrey observes, the time period alleged in *Matute* was measured by external events—the date the victim moved to California and the date a social worker called the police. These events defined the period because the victim testified she was raped "a couple of times a week" after her family moved to California, and the abuse presumably ended with the involvement of the police. (*Id.* at pp. 1440–1441.) Doe testified that Wandrey began to touch her breasts, and subsequently her vagina, after the move to the new neighborhood and the abuse ended when his relationship with Doe's mother terminated. The offenses alleged to have occurred during this approximately three-year period were charged in separate year-long periods because, as Doe testified, she tended to think about when things happened by reference to how old she was at the time.

24

Wandrey also attempts to distinguish *Matute* on the basis that the jury in the present case did not accept Doe's testimony in toto but rather deadlocked on 24 counts alleging, "the exact same acts during the exact same time periods" as in 24 counts for which he was convicted. As we have explained, the two groups of counts were not identical: The jury deadlocked on all counts based on Wandrey touching Doe's vagina when she was 12 years old and found Wandrey guilty on all counts based on his touching her breasts during that year.

Ignoring the difference between counts including substantial sexual conduct enhancement allegations and those not including such allegations, Wandrey sees the jury's deadlock on "identically-charged" offenses as a "peculiarity" of this case. In our view, the verdicts demonstrate the jury was able to distinguish counts supported by the evidence from counts as to which the evidence was less certain. Doe testified that Wandrey touched her breasts and her vagina throughout the year she was 13 and the year she was 14. This was not the case for the year she was 12. Doe testified that the molestation began after she moved to the new neighborhood, which was toward the end of her sixth-grade school year; she thought it was shortly before her twelfth birthday, but was not precise in pinpointing a date. She testified that the molestation began a few months after the move but, again, the timing was not precise. And she testified that the molestation began with Wandrey touching her breasts and only later moved on to him touching her vagina. Doe's testimony thus compressed the period in which the offenses alleged in counts 49 to 96 could have been committed to something less than the full year she was 12—more so for the counts based on vaginal touching than those based on breast touching. Given Doe's uncertainty about when during the year the vaginal touching began, the jury may simply have failed

25

to agree that she could be certain of the number of times it happened when she was 12 years old.

Wandrey's contention that Doe's testimony consisted of approximations and estimates is inaccurate. As can be seen from the description of her testimony above, Doe was asked for and provided many estimations of the approximate number of times she believed Wandrey touched her in a given way during a specified time period. But she testified to the minimum number of times Wandrey "definitely" touched her breasts and her vagina in each of the years at issue. Wandrey emphasizes the explicit approximations Doe gave—such as Wandrey touching her vagina three or four times a week, and therefore approximately 152 to 208 times, the year she was 14, and touching her breasts three or four times a week, approximately 150 times, when she was 12—but omits mention of the much smaller number of times Doe testified the acts "definitely" happened. It is this smaller number that corresponds to the number of counts Wandrey was charged with and convicted.

## D.

### *The Jury Unanimity Instruction Was Proper*

The parties agreed that a jury instruction on unanimity was necessary and that the court should use CALCRIM No. 3501—"Unanimity: When Generic Testimony of Offense Presented"—rather than the standard unanimity instruction, CALCRIM No. 3500. They disagreed, however, as to how the charged offenses should be described in the instruction. Over Wandrey's objection, the trial court adopted language proposed by the prosecutor that referred to the number of counts alleged to have been committed within each of the year-long time periods specified in the

26

information.[12] Wandrey contends that, by grouping identically charged offenses into year-long time periods, the instruction given failed to ensure unanimity.

The jury was instructed as follows: "The defendant is charged with the following: 24 counts of assault with the intent to commit a lewd act with a child under the age of 14 or with the intent to commit sexual penetration with a child under the age of 18 sometime during the period of April . . . 2013 to April . . . 2014.

"The defendant is charged with 24 counts of committing a lewd act with a child under the age of 14 during the period of April . . . 2013 to April . . . 2014.

"The defendant is charged with 62 counts of assault with the intent to commit a lewd act with a child under the age of 14 or with the intent to commit sexual penetration with a child under the age of 18 sometime during the period of April . . . 2014 to April . . . 2015.

"The defendant is charged with committing 62 counts of assault with the intent to commit sexual penetration with a child under the age of 18 sometime during the period of April . . . 2015 to April . . . 2016. [¶] . . . [¶]

"The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless, 1, you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he

---

[12] Defense counsel objected that the language describing the charges "risk[ed] collecting or lumping by the jurors" and asked for a "more generic 3501 unanimity instruction." The trial court agreed with the prosecutor that specifying the timeframe within which the charged conduct was alleged to have occurred would help the jury understand how to apply the instruction and consider the evidence.

committed for each offense, or 2, you all agree that the People have [proved] that this defendant committed all the acts alleged to have occurred during this time period and have proved that this defendant committed at least the number of offenses charged."

"CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees 'that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved the defendant committed at least the number of offenses charged].' " (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 556.) CALCRIM No. 3501 implements directions provided in *Jones*: "In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Jones, supra*, 51 Cal.3d at pp. 321–322.)

Wandrey argues that jurors could not have distinguished one identically charged offense from another as required by the first option under CALCRIM No. 3501, and that the fact they deadlocked on half the counts charged for the year Doe was 12 years old shows they did not unanimously agree he committed all the acts alleged, as described in the second option. As

we have discussed, Wandrey's characterization of the counts on which the jury deadlocked as identical to the other counts alleged for that time period is inaccurate:  The counts on which the jury deadlocked included substantial sexual conduct allegations; the counts on which the jury found Wandrey guilty did not.  The deadlock does not demonstrate an absence of unanimity, as Wandrey maintains.  To the contrary, the fact that the jury found Wandrey guilty of *all* counts based on his touching Doe's breasts when she was 12 years old and deadlocked on *all* counts based on his touching her vagina that year strongly suggests the jury's verdicts were unanimous.

## II.

### *The Trial Court Did Not Err in Requiring Witnesses to Wear Face Masks While Testifying*

Wandrey's trial took place in October and November 2020, during the Covid-19 pandemic and, over Wandrey's objection, witnesses wore masks while testifying.  The trial court denied Wandrey's request that the mask be removed or replaced with a clear shield when Doe was on the witness stand, which was shielded with plexiglass.  Wandrey contends that having Doe wear an opaque mask covering her mouth and nose while she testified deprived him of his constitutional right to confrontation and impaired his right to present a defense.  He maintains the mask was not necessary in light of other precautions in use, including plexiglass partitions and social distancing, and was not the least obtrusive means of balancing public safety against his trial rights.

" ' "[T]he Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact."  (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016.)  A central aspect of this guarantee is that it requires a witness " 'to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in

29

which he gives his testimony whether he is worthy of belief.' " (*Maryland v. Craig* (1990) 497 U.S. 836, 845, quoting *Mattox v. United States* (1895) 156 U.S. 237*,* 242–243.)

But face-to-face confrontation "is not the *sine qua non* of the confrontation right" and " 'must occasionally give way to considerations of public policy and the necessities of the case[.]' " (*Maryland v. Craig*, *supra*, 497 U.S. at pp. 847, 849, quoting *Mattox v. United States*, *supra*, 156 U.S. at p. 243.)  The defendant's constitutional right may be satisfied absent face-to-face confrontation "only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." (*Maryland*, at p. 850.)  This public policy exception "must be applied on a case-by-case basis." (*People v. Alvarez* (2022) 75 Cal.App.5th 28, 36 (*Alvarez*).)

A few California courts, considering trial conducted in the same time frame as Wandrey's, have recently issued opinions rejecting the view that requiring witnesses to wear face coverings for protection during the pandemic violated defendants' confrontation rights.  (*People v. Edwards* (2022) 76 Cal.App.5th 523; *People v. Lopez* (2022) 75 Cal.App.5th 227; *Alvarez*, *supra*, 75 Cal.App.5th at p. 39.)  These courts considered the importance of the state interest in "protecting the public from a contagious, and too often, lethal, disease," the relative inferiority of alternatives such as testimony behind a plexiglass shield as determined by guidance from the Centers for Disease Control and Prevention, and the relatively minimal limitation of masks covering a witness's mouth and nose on jurors' ability to assess the witness's demeanor.  (*Edwards*, at pp. 526–527; *Lopez*, at pp. 233–235; *Alvarez*, at pp. 36–38.)  The *Alvarez* court explained that "[a]lthough face masks covered the witnesses' mouths and the lower part of their noses,

30

significant aspects of their appearance, including the eyes, tops of the cheeks, and the body, were readily observable as was posture, tone of voice, cadence and numerous other aspects of demeanor."[13]

The trial court here carefully considered these same factors and balanced them against Wandrey's right of confrontation. In explaining its ruling, the court observed there was a "very real danger of COVID 19 and its transmission here in the court," as there was at that time a worldwide surge in transmission of the virus and Sonoma County was "at the wors[t] possible level or tier of California Governor's rating system relating to transmissions of the disease," and noted there had been recent outbreaks in the jails and despite the imposition of safety measures including personal protective equipment. The court noted that some of the jurors and others in the courtroom would come within the group highly vulnerable to the virus; described the limitations of the plexiglass shield that partially surrounded the witness stand; and noted that masks had been identified as the best tool for slowing transmission. And the court noted that even with a mask, the jurors would be able to hear a witness's voice and assess "her tone and inflections and pattern of speech," as well as that the witness's eyes would be

---

[13] As *Alvarez* further elaborated: " 'Demeanor includes the language of the entire body [and] jurors will still be able to observe most facets of the witnesses' demeanor. They can observe the witnesses from head to toe. They will be able to see how the witnesses move when they answer a question; how the witnesses hesitate; how fast the witnesses speak. They will be able to see the witnesses blink or roll their eyes, make furtive glances, and tilt their heads. The Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning.' " (*Alvarez, supra*, 75 Cal.App.5th at p. 38, quoting *United States v. Crittenden* (M.D.Ga. Aug. 21, 2020, No. 4:20-CR-7 (CDL)) 2020 U.S.Dist. Lexis 151950.)

fully visible and her body language would be easily observed "were she to become emotional, were she to scowl or become angry, were she to cho[o]se to not make any contact with her alleged offender."

There can be no question the court did not violate Wandrey's rights under the confrontation clause in concluding that requiring witnesses to wear masks was necessary in light of the local conditions with respect to the pandemic, the specific layout of the courtroom, and the available means of assessing the reliability of witnesses' testimony.

## III.

### *The Trial Court Did Not Err in Quashing Wandrey's Subpoena of Doe's Psychotherapy Records*

At trial, defense counsel orally moved for disclosure of Doe's therapist's treatment records, which counsel had subpoenaed (§ 1326)[14] and the court had received. Counsel stated the court might find it appropriate to review the records in camera before disclosing them to the defense, pursuant to procedures discussed in *People v. Hammon* (1997) 15 Cal.4th 1117 (*Hammon*) and *People v. Reber* (1986) 177 Cal.App.3d 523 (*Reber*).

The prosecution moved to quash the subpoena, arguing Wandrey had not shown sufficient justification for the court to review the records or release them to the defense. Wandrey responded that he was entitled to the records because they included "statements either consistent or inconsistent with [Doe's] testimony at trial." The court found there was "an inadequate showing" for in camera review because it was insufficient "to simply contend

---

[14] Under section 1326, the attorney for a defendant is one of the persons authorized to sign and issue a subpoena. (§ 1326, subd. (a)(4).) "When a defendant has issued a subpoena to a person or entity that is not a party for the production of books, papers, documents, or records, or copies thereof, the court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (§ 1326, subd. (c).)

that any and all psychological records might provide some type of inconsistent or consistent statement relating to the allegations."[15]

Citing *Hammon, supra*, 15 Cal.4th 1117, Wandrey contends he was deprived of a fair trial by the court's quashing of the subpoena without first reviewing the records in camera. We review the trial court's decision for abuse of discretion. (*Facebook, Inc. v. Superior Court of San Diego County* (2020) 10 Cal.5th 329, 359 (*Facebook*).)

The fundamental principle Wandrey relies upon derives from *Davis v. Alaska* (1974) 415 U.S. 308 (*Davis*), which found a defendant's constitutional right to confrontation was violated when he was precluded from cross-examining a crucial prosecution witness for bias on the basis that the information he sought to elicit was confidential under state law. Applying the principles established in *Davis* to a defendant's attempt to obtain *pretrial* discovery of victims' psychotherapy records, *Reber* held the court erred "to the extent it failed to (1) obtain and examine in camera all the materials under subpoena, (2) weigh defendants' constitutionally based claim of need against the statutory privilege invoked by the People, (3) determine which privileged matters, if any, were essential to the vindication of defendants' rights of confrontation and (4) create a record adequate to review its ruling." (*Reber, supra*, 177 Cal.App.3d at p. 532.) *Hammon* subsequently disapproved *Reber* and a line of cases following it, finding trial courts are "not required, at the *pretrial* stage of the proceedings, to review or grant discovery of privileged

---

[15] After defense counsel urged there was a "compelling basis to obtain what the psychologist said he was told, including when he was first told and the number of times it was discussed and what was discussed," the court noted the therapist had given only "general" testimony regarding Doe's disclosure with "no specifics."

information in the hands of third party psychotherapy providers." (*Hammon*, *supra*, 15 Cal.4th at p. 1119, italics added.)

Wandrey appears to assume *Hammon* left *Reber* intact with respect to discovery during trial. He relies on the *Hammon* court's statement—made in the course of distinguishing the trial right at issue in *Davis* from—the pretrial context in *Reber*—that "[w]hen a defendant proposes to impeach a critical prosecution witness with questions that call for privileged information, the trial court may be called upon, as in *Davis*, to balance the defendant's need for cross-examination and the state policies the privilege is intended to serve." (*Hammon*, *supra*, 15 Cal.4th at p. 1127.) *Hammon* did not address what standard would govern a trial court's decision whether to review confidential records during trial to determine whether they should be released to the defense, but Wandrey assumes a showing of good cause would be required: He points to the procedure *Reber* established "to be followed once the defendant shows good cause for discovery of a witness's mental health records" (*Susan S. v. Israels* (1997) 55 Cal.App.4th 1290, 1295) and urges that " 'the good cause requirement embodies a "relatively low threshold" for discovery' [citation], under which a defendant need demonstrate only 'a logical link between the defense proposed and the [information sought]' and describe with some specificity 'how the discovery being sought would support such a defense . . . .' " (*People v. Gaines* (2009) 46 Cal.4th 172, 182 [discussing discovery of confidential peace officer personnel records under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531].)

" 'A defendant's motion for discovery must . . . describe the requested information with at least some degree of specificity and must be sustained by *plausible justification*.' " (*Facebook, supra,* 10 Cal.5th at p. 348, quoting *Ballard v. Superior Court* (1966) 64 Cal.2d 159, 167.) Where the information

34

sought is confidential or privileged, "plausible justification—which, as noted above, must in *all* cases be 'so substantiated as to make the seizure constitutionally reasonable' [citation]—must be subject to even closer examination in the absence of an apparent relationship between the alleged crime and the sought private communications. (Cf. *Hammon*, *supra*, 15 Cal.4th at p. 1127 [courts should be especially reluctant to facilitate pretrial disclosure of privileged or confidential information that, as it may turn out, is unnecessary to use or introduce at trial].)" (*Facebook*, at p. 355.) As the *Facebook* court explained with respect to a defendant's effort to compel production of a victim's restricted social media posts and private messages, required disclosure, "even to a judge for ex parte review (see Pen. Code § 1326, subd. (c)), as a predicate to possible broader disclosure, itself constitutes a significant impingement on" privacy. (*Id.* at pp. 353, 354–355.)

The only basis Wandrey offered the trial court for seeking disclosure of Doe's records was that, because Jacobs testified Doe disclosed abuse to him at multiple sessions over the course of several months, "they include statements either consistent or inconsistent with her testimony at trial." As the trial court pointed out, this could be said in any and every case in which the complaining witness engaged in mental health counseling. If this were sufficient as a justification for review of confidential records, the "good cause" requirement would be meaningless.

Wandrey makes further arguments on appeal, including that because the process of therapy can impact recollection and Jacobs did not report the abuse until after Doe informed him she was ready, the records might explain Doe's "change of opinion" as to whether Wandrey acted with lewd intent in the episodes during the month or so before he began touching her breasts when he would pull her back toward him as she sat on his lap at the

35

computer.[16]  He made no such argument in the trial court, and " '[a] party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 980, quoting *People v. Partida* (2005) 37 Cal.4th 428, 435.)  In any event, none of Wandrey's convictions were based on this conduct, and he suggests no reason to think Doe's statements to her therapist about the breast touching and vaginal touching would have differed from her testimony at trial.

We find no abuse of discretion.

## IV.

### *The Jury Instruction on Uncharged Offenses, if Erroneous, Was Not Prejudicial*

Doe described sexual acts Wandrey committed against her when the two were in Hawaii.  Wandrey was not charged with any offenses based on these acts, but they were introduced as evidence of propensity to commit sexual acts pursuant to Evidence Code section 1108.  Wandrey contends the jury instruction concerning these uncharged sexual offenses erroneously directed jurors to apply California law to acts committed in Hawaii, which he views as creating an unlawful mandatory presumption, lessening the prosecution's burden of proof and depriving him of a fair trial.

"In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).)

---

[16] Doe testified on direct examination that Wandrey's conduct made her uncomfortable, but she tried to ignore it.  On cross-examination, asked if she was unsure whether this conduct was sexual, Doe testified that she "would assume" it was because he was pulling her closer to his genital area, and that "[a]t the time I didn't know, but looking back at it, it seemed sexual to me."

"Subject to Evidence Code section 352, Evidence Code section 1108 permits a jury to consider prior incidents of sexual misconduct for the purpose of showing a defendant's propensity to commit offenses of the same type, and essentially allowing such evidence to be used in determining whether the defendant is guilty of the current sexual offense charge." (*People v. Miramontes* (2010) 189 Cal.App.4th 1085, 1097 (*Miramontes*); *People v. Falsetta* (1999) 21 Cal.4th 903, 911.) Evidence Code section 1108 "was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Falsetta*, at p. 911.)

The jury was instructed pursuant to CALCRIM No. 1191A as follows:

"The People presented evidence that the defendant committed the crime of sexual penetration of a child under the age of 18 which occurred in Hawaii that was not charged in this case. This crime is defined for you in these instructions. (Instruction 1102 [CALCRIM No. 1102, defining sexual penetration with person under 18 (§ 289, subd. (h))].) . . .

"If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit a lewd act upon a child under the age of 14, and assault with the intent to commit a lewd act upon a child under 14 or sexual penetration of a child under the age of 18 as charged here. . . ."

Wandrey's claim of error is based on Evidence Code section 1108's definition of "sexual offense" as "a crime under the law of a state or of the

37

United States" involving specified sexual conduct.[17] Wandrey argues this definition requires that an uncharged sexual offense used to infer propensity must be a crime under the law of the jurisdiction in which it was committed, but the instruction erroneously directed the jury to use California's definition of "lewd act on a child under 18." That definition, he argues, describes conduct that is not a crime in Hawaii. Wandrey's argument fails for several reasons.

First, Wandrey forfeited this claim by failing to object to the instruction on these grounds at trial.[18] (*People v. Seijas* (2005) 36 Cal.4th 291, 302.) Wandrey points out that claims of instructional error "may be asserted even without objection if they affect the defendant's substantial rights." (*Ibid.*) "Ascertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Anderson* (1994) 26 Cal.App.4th 1241, 1249.) Here, Wandrey could not have been prejudiced because even if he is correct that Evidence Code section 1108 required that the uncharged offense be a crime in the jurisdiction where it was committed, he has not demonstrated that the conduct Doe described was not criminal under Hawaii law.

---

[17] The uncharged offense must involve conduct proscribed by enumerated provisions of the Penal Code, including sections 220, 288, and 289, or meeting specified criteria, including "[c]ontact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person." (Evid. Code, § 1108, subd. (d)(1)(A)–(F).)

[18] Defense counsel did suggest unrelated modifications to the instruction, which the trial court rejected.

Wandrey points to section 707-732 of the Hawaii Revised Statutes as support for his assertion that the conduct described in CALCRIM No. 1102 is not a crime in Hawaii. That statute provides: "(1) A person commits the offense of sexual assault in the third degree if the person: . . . [¶] . . . [¶] (c) Knowingly engages in sexual contact with a person who is at least fourteen years old but less than sixteen years old . . . ; provided that the actor is: [¶] (i) No less than five years older than the minor; and [¶] (ii) Not legally married to the minor[.]" (Haw. Rev. Stat., § 707-732.) The conduct Doe described—Wandrey touching her vagina—appears to fall squarely within the definition of this offense. The conduct also appears to directly violate Hawaii Revised Statute section 707-730, which provides that a person "commits the offense of sexual assault in the first degree if the person: . . . [¶] . . . [¶] (c) Knowingly engages in sexual penetration with a person who is at least fourteen years old but less than sixteen years old; provided that the actor is: [¶] (i) No less than five years older than the minor; and [¶] (ii) Not legally married to the minor[.]"

The only explanation Wandrey offers for his conclusion that the conduct in Hawaii did not constitute an offense under that state's laws is that "the age of consent in Hawaii is 16, with a close-in-age exception applicable for ages 14 and 15." The relevance of this point escapes us, as Doe was 14 years old at the time of the conduct she described and, in any event, did not consent to the sexual conduct. To the extent Wandrey's argument is that the jury was permitted to use evidence of conduct that was not an offense in Hawaii to infer a propensity to commit the similar conduct alleged in the present case, the argument necessarily fails.

Wandrey additionally argues the instruction created an unlawful mandatory presumption by directing the jurors that they could consider the

Hawaii conduct as propensity evidence if it constituted a crime under California law, thereby removing from the jury the factual question whether the conduct satisfied the elements of a sexual offense under Hawaii law. We disagree. The instruction did not remove any element of the charged offenses from the jury's consideration, as in the cases Wandrey cites. (*People v. Flood* (1998) 18 Cal.4th 470 [instruction that officers who pursued fleeing defendant were "peace officers" in prosecution for evading vehicle operated by pursuing peace officer]; *People v. Vanegas* (2004) 115 Cal.App.4th 592 [instruction that violation of basic speed law is act inherently dangerous to human life and safety in prosecution for second degree murder based on implied malice].) The factual issue Wandrey claims was erroneously removed from the jury's consideration—whether his conduct was criminal in Hawaii— did not bear on any element of the charged offenses, only on whether the uncharged offense could be used as a basis for inferring a propensity to commit such crimes. (*People v. Jandres* (2014) 226 Cal.App.4th 340, 359 [propensity not an element of charged sexual offenses].) And the inference permitted by the instruction was just that—permitted, not mandatory. (*People v. Reliford* (2003) 29 Cal.4th 1007, 1015; *People v. Anderson* (2012) 208 Cal.App.4th 851, 896.)

In short, if Wandrey is correct that Evidence Code section 1108 requires that an uncharged offense be a crime in the jurisdiction where it was committed—a point we need not decide[19]—any error in referring the jury to

---

[19] *Miramontes* offers some support for a conclusion that the critical question is whether uncharged conduct violates California law. The case was about admissibility of evidence, not instructional error, and does not appear to have involved any suggestion the conduct was not a crime in the foreign jurisdiction; the argument was that Evidence Code section 1108 does not permit use of uncharged *foreign* offenses (there, offenses committed in Mexico) because such offenses are not expressly listed in the definition in

the California crime of sexual penetration of a child was harmless. Since such error regarding propensity evidence does not involve a constitutionally impermissible mandatory presumption or relieve the prosecution of its burden of proving each element of the charged offenses, it would be subject to state harmless error analysis. (*People v. Jandres, supra,* 226 Cal.App.4th at p. 359; *People v. Watson* (1956) 46 Cal.2d 818, 836.) Wandrey could not have been prejudiced. First, as we have said, his assertion that the conduct was not criminal under Hawaii law is incorrect. Second, in light of Doe's testimony that Wandrey repeatedly molested her for years in Sonoma County by engaging in the same conduct she described him committing in Hawaii, the propensity the jury was permitted to infer could not have been critical to its determination that Wandrey committed the offenses on which he was found guilty.

---

subdivision (d) of the statute. (*Miramontes*, *supra*, 189 Cal.App.4th at p. 1099.)

Still, *Miramontes* described Evidence Code section 1108 as "permit[ting] a court to consider the substance of certain prior sexual misconduct that was actually committed elsewhere, if such conduct would amount to a 'crime under the law' of a jurisdiction that proscribes certain identified types of sexual misconduct, such as California" (*Miramontes*, *supra*, 189 Cal.App.4th at pp. 1100–1101) and observed, "there is no reason as a matter of law, logic or statutory construction to withhold reliable evidence of such foreign prior uncharged misconduct from a jury, where, as here, the offer of proof showed that those prior incidents '*involved conduct which satisfies all of the elements of the comparable* California [sex] offense.'" (*Id.* at p. 1101, quoting *People v. Myers* (1993) 5 Cal.4th 1193, 1195 [out of state priors].) The court noted that the definitions in subdivision (d) of Evidence Code section 1108 "include descriptions of the substance of unlawful conduct involved in a prior offense, wherever it may have occurred. The principal consideration in this inquiry is whether the comparable prior, essentially similar, conduct occurred, not where it occurred, for purposes of determining if California consequences will ensue, such as its admissibility under Evidence Code section 1108." (*Miramontes*, at p. 1099.)

# V.

## *Sentencing Issues*

Wandrey's 756-year prison term is the result of the trial court's imposition of full, consecutive aggravated terms on each of his 84 convictions for sexual assault (§ 220, subd. (a)(2)). The trial court imposed sentence on counts odd-numbered counts 49 through 71 and 121 through 219, and all counts 221 through 230, pursuant to section 667.6, subdivision (d), which makes full consecutive terms mandatory; it imposed sentence on odd-numbered counts 97 through 119 pursuant to subdivision (c) of section 667.6, which permits full consecutive terms as an exercise of discretion.

Wandrey contends his sentence is unlawful because none of his offenses are eligible for full consecutive sentencing under section 667.6. Alternatively, he argues that in determining whether his offenses were committed on "separate occasions"—the statutory prerequisite for mandatory full consecutive term sentencing—the trial court deprived him of his right to a *jury* determination of the issue. Finally, based on a postsentencing statutory amendment, he argues resentencing is required because aggravated terms may be imposed only if the aggravating circumstances have been stipulated to by the defendant or found true beyond a reasonable doubt by the jury.

## A.

### *Wandrey's Convictions of Assault with Intent to Commit a Sexual Offense Are Eligible for Sentencing Under Section 667.6*

"The Legislature enacted section 667.6 in 1979 to significantly increase prison terms for persons convicted of certain violent sex offenses. (Stats. 1979, ch. 944, § 10, p. 3258.) Section 667.6, subdivisions (c) and (d) address the terms of imprisonment for 10 listed sex crimes commonly referred to as " 'violent sex crimes.' " (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 123.)

42

Section 667.6, subdivision (c), provides in pertinent part: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion."

Subdivision (d)(1) of section 667.6 provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions."

Subdivision (e) of section 667.6 lists the offenses to which the section applies as follows: "(1) Rape, in violation of paragraph (2), (3), (6), or (7) of subdivision (a) of Section 261. [¶] (2) Rape, in violation of paragraph (1), (4), or (5) of subdivision (a) of former Section 262. [¶] (3) Rape or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 286. [¶] (5) Lewd or lascivious act, in violation of subdivision (b) of Section 288. [¶] (6) Continuous sexual abuse of a child, in violation of Section 288.5. [¶] (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d) or (k), of Section 287 or of former Section 288a. [¶] (8) Sexual penetration, in violation of subdivision (a) or (g) of Section 289. [¶] (9) As a present offense under subdivision (c) or (d), assault with intent to commit a specified sexual offense, in violation of Section 220[.] [¶] (10) As a prior conviction under subdivision (a) or (b), an offense committed in another jurisdiction that includes all of the elements of an offense specified in this subdivision."

Wandrey was sentenced under section 667.6 for his convictions of assault with intent to commit a sexual offense in violation of section 220, subdivision (a)(2). Section 220, subdivision (a)(2) provides that "any person

who assaults another person under 18 years of age with the intent to commit rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289 shall be punished by imprisonment in the state prison for five, seven, or nine years."

"[A]ssault with intent to commit a specified sexual offense, in violation of Section 220" is listed in section 667.6, subdivision (e)(9). Wandrey contends, however, that subdivision (e)(9) should be read as applying only to assault with intent to commit one of the sexual offenses enumerated in section 667.6, subdivision (e). Because section 667.6, subdivision (e), does not include violation of section 288, subdivision (a), Wandrey argues his convictions for assault with intent to commit this non-forcible offense are not subject to sentencing under section 667.6.[20] With respect to lewd and lascivious conduct, section 667.6, subdivision (e) lists only violation of subdivision (b)—commission of a lewd and lascivious act by use of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person."[21]

---

[20] Although Wandrey did not raise this objection in the trial court, his argument "raises a claim of unauthorized sentence that is reviewable even in the absence of an objection in the trial court. (*People v. Stowell* (2003) 31 Cal.4th 1107, 1113; *People v. Smith* (2001) 24 Cal.4th 849, 852.)" (*People v. Maharaj* (2012) 204 Cal.App.4th 641, 648.)

[21] With reference to lewd acts based on touching Doe's vagina, Wandrey points out that section 667.6, subdivision (e)(8) describes "[s]exual penetration, in violation of subdivision (a) or (g) of Section 289." Subdivision (a) of section 289 refers to sexual penetration "accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Wandrey does not explain how the inclusion of section 289, subdivision (g), supports his argument: That subdivision refers to sexual penetration "accomplished against the victim's will by threatening to use the authority of a public

Wandrey argues that by referring to "assault with intent to commit *a specified sexual offense*, in violation of Section 220," section 667.6, subdivision (e), meant to include only assaults with intent to commit a sexual assault *specified in section 667.6* and not " 'any' sexual offense in the Penal Code." Otherwise, he maintains, the term "specified" in section 667.6, subdivision (e)(9), would have no meaning. " 'If possible, significance should be given to every word, phrase, sentence and part of an act in pursuance of the legislative purpose.' (*Select Base Materials*[*, Inc. v. Board of Equal.* (1959)] 51 Cal.2d 640, 645); 'a construction making some words surplusage is to be avoided.' (*Watkins v. Real Estate Commissioner* (1960) 182 Cal.App.2d 397, 400.)" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230.)

The principles of statutory construction Wandrey relies on are correct, but we disagree with his conclusion. In our view, the most plausible interpretation of section 667.6, subdivision (e)(9), is that "a specified sexual offense" refers to the sexual offenses specified *in section 220.*

First, the evolution of section 667.6 indicates this is the correct interpretation. Prior to 1987, section 667.6 did not apply to violations of section 220. (See Stats. 1987, ch. 1068, § 4; Assem. Bill No. 1826 (1987–1988 Reg. Sess.) § 4.)[22] In 1988, subdivisions (c) and (d) of section 667.6 were

---

official to incarcerate, arrest, or deport the victim or another," which does not describe a forcible offense.

[22] Section 667.6, subdivision (d) of the statute read: "A full, separate, and consecutive term shall be served for each violation of subdivision (2) or (3) of Section 261, Section 264.1, subdivision (b) of Section 288, Section 289, or of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person if the crimes involve separate victims or involve the same victim on separate occasions." (Stats. 1987, ch. 1068, § 4.)

amended to add to the list of offenses for which a full, separate, and consecutive term was required, "each violation of Section 220, other than an assault with intent to commit mayhem, provided the person has been convicted previously of violating Section 220 for an offense other than an assault with intent to commit mayhem[.]"  (Stats. 1988, ch. 1185, § 1; Assem. Bill No. 4284 (1987–1988 Reg. Sess.) § 1.)  Since section 220 refers to assaults with intent to commit mayhem or several enumerated sexual offenses, the wording of section 667.6's reference to section 220 unambiguously includes all the sexual offenses enumerated in section 220.

Section 667.6 was subsequently amended several times to add additional offenses,[23] but the language pertaining to section 220 remained the same until 2006, when legislative and initiative amendments changed the structure of the statute to list the qualifying offenses in subdivision (e) and changed the wording related to section 220 to its current form:  "As a present offense under subdivision (c) or (d), assault with intent to commit a specified sexual offense, in violation of Section 220."  (Stats. 2006, ch. 337, § 32, eff. Sept. 20, 2006; initiative measure (Proposition 83) § 11, eff. Nov. 1, 2006.)  As far as we are aware, the legislative history for the 2006 amendments indicates no intent to change the intended scope of the reference to section 220.

Further support for reading "specified sexual offense" in section 667.6, subdivision (e)(9), as referring to a sexual offense specified in section 220 appears when the language of this subdivision is compared to subdivision (e)(10) of the statute.  Subdivision (e)(10), describing offenses supporting

---

[23] For example, continuous sexual abuse of a child was added to section 288.5, subdivision (c) in 1989 (Stats. 1989, ch. 1402, § 7), and specified subdivisions of sections 288a and 286 were added in 1993 (Stats. 1993, ch. 127, § 1).

46

enhancements under subdivisions (a) or (b) of section 667.6, refers to "an offense committed in another jurisdiction that includes all of the elements of an offense *specified in this subdivision*." (Italics added.) This language demonstrates that the Legislature knows how to express a reference to offenses specified within the same statute. Had the Legislature intended to include in subdivision (e)(9) only assaults with intent to commit a sexual offense specified within section 667.6, it could easily have worded subdivision (e)(9), to refer to "assault with intent to commit a sexual offense specified *in this subdivision*, in violation of Section 220"—as it did in at least one statute referring to section 220.[24]

"'It is a settled rule of statutory construction that where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different legislative intent existed with reference to the different statutes.'" (*In re Jennings* (2004) 34 Cal.4th 254, 273, quoting *People v. Norwood* (1972) 26 Cal.App.3d 148, 156.) That the Legislature did not define the assaults included in section 667.6, subdivision (e)(9) by reference to sexual offenses "specified in this subdivision" supports a view the Legislature did not intend to change the scope of subdivision (e)(9) by including assault

---

[24] Section 1203.066 provides that certain persons convicted of violating sections 288 or 288.5 shall not be granted probation or specified other relief, such as those who committed the offense "by the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person," caused bodily injury to the child or used a weapon during commission of the offense. (§ 1203.066, subd. (a)(1), (2) & (4).) Subdivision (a)(5) of the statute refers to a person who has previously been convicted of violating enumerated statutes, including "assaulting another person with intent to commit a crime specified *in this paragraph* in violation of Section 220." (Italics added.)

with intent to commit a sexual offense specified in section 667.6 rather than one specified in section 220.

As the Attorney General points out, the phrasing of section 667.6's reference to offenses violating section 220 is not unique: Several provisions of the Penal Code which refer to violations of section 220 in descriptive terms (as opposed to simply by number) use substantially the same language. (§§ 1203.06, subd. (1)(G) [probation prohibition for use of firearm in commission of offenses including "[a]ssault with intent to commit a specified sexual offense, in violation of Section 220"; 1203.065, subd. (b)(1) [probation limitation for person convicted of violating "[s]ection 220 for assault with intent to commit a specified sexual offense"]; 1203.075, subd. (a)(7) [probation prohibition for infliction of great bodily injury during "[a]ssault with intent to commit a specified sexual offense, in violation of Section 220"]; 12022.3 [enhancement for "each violation of Section 220 involving a specified sexual offense"]; 12022.8 [enhancement for infliction of great bodily injury in a violation of Section 220 involving a specified sexual offense]; 667.5, subd. (c)(15) ["violent felony" includes "[a]ssault with the intent to commit a specified felony, in violation of Section 220"].) Indeed, the title of the statute (albeit unofficial) uses this phrase: "Assault with intent to commit mayhem, rape, sodomy, oral copulation or other specified offense . . ." (West's Annotated California Codes) or "Assault with intent to commit mayhem or specified sex offenses . . ." (Deerings California Codes Annotated).

Wandrey's preferred interpretation is further undermined by comparison of subdivision (e)(9) to the other paragraphs of subdivision (e) of section 667.6. All but one of the offenses in subdivision (e) are identified with a descriptive term followed by "in violation of" a statutory reference. For example: "Rape, in violation of paragraph (2), (3), (6) or (7) of subdivision (a)

48

of Section 261"; "Rape or sexual penetration, in concert, in violation of Section 264.1"; "Continuous sexual abuse of a child, in violation of Section 288.5"; and "Lewd and lascivious act, in violation of subdivision (b) of Section 288." (§ 667.6, subd. (e)(1), (3), (5) & (6).)  Consistent with this structure, subdivision (e)(9), identifies the offense descriptively and by reference to the proscribing statute—assault with intent to commit a specified sexual offense, in violation of section 220.  Reading "[a]ssault with intent to commit a specified sexual offense, in violation of Section 220" to mean assault with intent to commit an offense specified *in section 667.6* would be inconsistent with the phraseology of all the other paragraphs of subdivision (e) except subdivision (e)(10)—and subdivision (e)(10), as discussed above, expressly refers to "an offense specified in this subdivision."

Wandrey argues "it is the forcible nature of a lewd act that adds an offense to section 667.6's subdivision (e) list."[25]  Not entirely:  Continuous sexual abuse of a child (§ 288.5) is on the list and does not necessarily require forcible conduct.  The list also includes at least one nonforcible form of several other offenses, including rape, sodomy, oral copulation and sexual penetration accomplished "against the victim's will by threatening to use the

_____

[25] Wandrey cites *People v. Goodliffe* (2009) 177 Cal.App.4th 723 as "noting that Section 667.6[, subdivision] (e) distinguishes between 'a forcible lewd act on a child as defined by section 288, subdivision (b)' and a 'nonforcible molestation[]' of the same victim."  The distinction he quotes was actually spelled out in *People v. Maharaj*, *supra*, 204 Cal.App.4th at page 649, which explained that the defendant in *Goodliffe* was convicted of one offense specified in section 667.6, subdivision (e)—a lewd act in violation of section 288, subdivision (b)—and three "nonforcible molestations of the same victim." (*Maharaj,* at p. 649.)  The "nonforcible molestations" were violations of statutes not listed in section 667.6, subdivision (e).  Neither *Goodliffe* nor *Maharaj* involved sentencing for convictions of sexual assault in violation of section 220 and neither provide guidance on the interpretation of subdivision (e)(9) of section 667.6.

49

authority of a public official to incarcerate, arrest or deport the victim or another." (§ 667.6, subd. (e)(1) [violation of § 261, subd. (7)], (e)(4) [violation of § 286, subd. (k)], (e)(7) [violation of § 287, subd. (k)], (e)(8) [violation of § 289, subd. (g)].)[26]

To be sure, the sexual offenses designated in section 667.6, subdivision (e) as subject to consecutive full-term sentences are generally the more egregious forms of each type of offense. Wandrey's point, presumably, is that the lewd acts he was convicted of did not rise to this level and therefore did not justify the sentence he received. But the Legislature, which deems assault with intent to commit an offense specified in section 220 a "violent felony" (§ 667.5, subd. (c)(15)), has determined that assaults with intent to

---

[26] The concept of force is not absent from a violation of section 220 even if the lewd act intended would not require proof of physical force. Here, with respect to odd-numbered counts 49 through 219, the jury was instructed pursuant to CALCRIM No. 890 that the People were required to prove Wandrey "did an act that by its nature would directly and probably result in the application of force to a person"; "when [Wandrey] acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone"; and "when the defendant acted, he had the present ability to apply force to a person."

The "force" contemplated by this instruction, however, is not the same as what is required for "forcible" sexual offenses. The jury here was instructed, with respect to sexual assault under section 220, that "[t]he terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind." In contrast to sexual assault, to prove commission of a sexual act by means of force, the force must be sufficient to overcome the victim's will (e.g., CALCRIM No. 1000 [rape by force]; CALCRIM No. 1045 [penetration by force]) or, for a lewd and lascivious act on a child, "substantially different from or substantially greater than the force needed to accomplish the act itself" (CALCRIM No. 1111).

50

commit the sexual offenses included in section 220 warrant punishment under section 667.6.  If section 667.5, subdivision (e)(9) is to be limited to a subset of such assaults—those with intent to commit more egregious forms of the sexual offenses specified in section 220—it is for the Legislature to impose this limitation.[27]

## B.

### *Consecutive Sentencing Pursuant to Section 667.6 Did Not Violate Wandrey's Right to a Jury Trial*

As we have said, the trial court imposed sentence on all but 12 of Wandrey's convictions pursuant to section 667.6, subdivision (d), which mandates imposition of full, separate, and consecutive terms "if the crimes involve . . . the same victim on separate occasions."  Wandrey contends he was deprived of his constitutional right to a jury trial when the trial court made the factual determination that the offenses were committed on separate occasions.[28]  He reasons that this factual finding increased the mandatory

---

[27] As this case illustrates, the inclusion of all assaults with intent to commit sex offenses in violation of section 220 exacerbates the potential for dramatic disparities in sentencing resulting from prosecutors' discretion to charge the same conduct either as continuous sexual abuse of a child (§ 288.5) or as separate sexual assaults (§ 220).  A conviction for continuous sexual abuse of a child carries a presumptive sentence of 12 years and a maximum sentence of 16 years.  By instead charging Wandrey with numerous violations of section 220, triggering sentencing under section 667.6, the prosecutor increased Wandrey's sentence exposure to hundreds of years— the same sentencing exposure he would have had if his sexual acts had been even more egregious in nature or circumstance (i.e., even more invasive sexual offense, use of physical force or weapon, threat of bodily injury).  As we have indicated, this sentencing disparity may warrant review by the Legislature.

[28] This issue is currently before the California Supreme Court in *People v. Catarino,* review granted January 19, 2022, S271828.  The court limited the issues to the following:  Does section 667.6, subdivision (d), which requires that a full, separate, and consecutive term must be imposed for

51

minimum sentence for his offenses and, under *Alleyne v. United States* (2013) 570 U.S. 99, 103 (*Alleyne*), "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury."

*Alleyne* was based on "the original meaning of the Sixth Amendment" and the United States Supreme Court's earlier decision in *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), which held that " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' " (*Id.* at p. 525; *Alleyne*, *supra*, 570 U.S. at p. 103.) *Alleyne* held that a fact increasing the statutory *minimum* is as much an element that must be submitted to the jury as a fact increasing the statutory *maximum*. (*Id.* at p. 103.) In so doing, the court overruled its prior decision in *Harris v. United States* (2002) 536 U.S. 545, which had distinguished the two situations.

*People v. King* (2010) 183 Cal.App.4th 1281, a case Wandrey does not address in his briefs, summarily rejected the argument that the "separate occasions" issue under section 667.6, subdivision (d), must be submitted to the jury, stating, "the United States and California Supreme Courts have held that the decision whether to run individual sentences consecutively or concurrently does not implicate the Sixth Amendment right to jury trial. [Citations.]" (*King*, at p. 1324.) *Oregon v. Ice* (2009) 555 U.S. 160 (*Ice*) provides the explanation. The court explained that *Apprendi* and *Blakely v. Washington* (2004) 542 U.S. 296[29] were "rooted in the historic jury function—

---

certain offenses if the sentencing court finds that the crimes involved the same victim on separate occasions, comply with the Sixth Amendment to the United States Constitution?

[29] *Blakely* "clarified that 'the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of*

determining whether the prosecution has proved each element of an offense beyond a reasonable doubt," while the question whether the Sixth Amendment mandates "jury determination of any fact declared necessary to the imposition of consecutive, in lieu of concurrent, sentences" "concerns a sentencing function in which the jury traditionally played no part[.]" (*Ice*, at pp. 163–164.) "The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' *Apprendi*, [*supra*,] 530 U.S. at 477. Instead, specification of the regime for administering multiple sentences has long been considered the prerogative of state legislatures." (*Ice*, at p. 168.)

Wandrey argues that *Ice*, which involved discretionary consecutive sentencing, does not control the result in the present case because *Alleyne* changed the "legal landscape" with respect to *mandatory* consecutive sentences. This distinction is irrelevant: *Ice* did not turn on the fact that the statute at issue permitted, but did not require, judges to impose consecutive sentences.[30] Rather, the court explained that "twin considerations— historical practice and respect for state sovereignty—counsel against extending *Apprendi*'s rule to the imposition of sentences for discrete crimes. The decision to impose sentences consecutively is not within the jury function that 'extends down centuries into the common law.' [Citation.] Instead, specification of the regime for administering multiple sentences has long been

_____

*the facts reflected in the jury verdict or admitted by the defendant.' "* (*Washington v. Recuenco* (2006) 548 U.S. 212, 216, quoting *Blakely v. Washington, supra,* 542 U.S. at p. 303.)

[30] The argument also overlooks the fact that even without the separate occasions findings, section 667.6, subdivision (c), authorized imposition of full consecutive sentences as an exercise of discretion. In fact, the trial court here exercised its discretion to impose such full consecutive terms on the counts as to which it did *not* find separate occasions.

53

considered the prerogative of state legislatures." (*Ice, supra,* 555 U.S. at p. 168.)

*Alleyne*, like *Apprendi*, was concerned with factfinding that increased the penalty for a particular offense. Applying the principle that "[t]he touchstone for determining whether a fact must be found by a jury beyond a reasonable doubt is whether the fact constitutes an 'element' or 'ingredient' of the charged offense" (*Alleyne, supra,* 570 U.S. at p. 107), the court concluded that a fact that increases the mandatory minimum sentence for the offense "is an 'element' that must be submitted to the jury." (*Id.* at p. 103.) The factual question whether multiple offenses were committed on separate occasions does not involve an element of any discrete offense.

Nothing in *Alleyne* alters the court's analysis in *Ice* of factfinding related to consecutive sentencing. As the California Supreme Court observed two years after *Alleyne* was decided: "In *Ice*, the high court concluded that the Sixth Amendment's protections must be viewed in light of the jury trial right as it existed at the time the Constitution was adopted, and cannot intrude unduly on the sovereign states' historical dominion over the subsequent development of their penal systems. Hence, the *Ice* court determined, *Apprendi* has no application to sentencing decisions in which juries played no factfinding role at common law." (*People v. Mosley* (2015) 60 Cal.4th 1044, 1049–1050.)[31]

---

[31] *Mosley* held there is no right to a jury trial on factual findings subjecting a defendant to sex offender residency restrictions. (*People v. Mosley, supra,* 60 Cal.4th at pp. 1048, 1050.)

## C.

### *The Error in Imposing Upper Terms Without Jury Findings on Aggravating Circumstances Requires Remand*

Wandrey contends this case must be remanded for resentencing because a change in law subsequent to his sentencing hearing has rendered his upper term sentences unlawful.

At the time Wandrey was sentenced, section 1170, subdivision (b), gave the trial courts broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.) Effective January 1, 2022, Senate Bill No. 567 (2021–2022 Reg. Sess.), amended section 1170, subdivision (b), in a number of respects, one of which was to make the middle term of imprisonment the presumptive sentence. (See § 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[W]hen a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2)." (§ 1170, subd. (b)(1).) "A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.)

The parties agree that the Senate Bill No. 567 amendments apply retroactively to this case as "an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court (Lara)* (2018)

4 Cal.5th 299, 308.)" (*People v. Flores* (2021) 73 Cal.App.5th 1032, 1038.)[32] The Attorney General, however, argues remand is unnecessary because the error was harmless.

Error in relying on facts not found by the jury to impose an aggravated term is subject to review under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, as applied in *Neder v. United States* (1999) 527 U.S. 1 and *Washington v. Recuenco, supra*, 548 U.S. 212. (*People v Sandoval* (2007) 41 Cal.4th 825, 838 (*Sandoval*).) *Sandoval*, addressing *Cunningham*[33] error—denial of the right to a jury trial on aggravating circumstances under statute permitting sentencing judge to find the facts exposing a defendant to an elevated sentence—described the relevant harmless error analysis as requiring the reviewing court to "determine whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (*Sandoval*, at p. 838.) "[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Id.* at p. 839.)

The issue in the present case is not precisely the same as with *Cunningham* error. In the *Cunningham* situation, the trial court has

---

[32] " 'For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of certiorari in the United States Supreme Court.' ([*People v. Lopez* (2019) 42 Cal.App.5th 337,] 341– 342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)" (*People v. Flores, supra*, 73 Cal.App.5th at p. 1038.)

[33] *Cunningham v. California* (2007) 549 U.S. 270.

properly exercised its discretion in determining the sentence and the question is whether the facts underlying its decision were determined according to the required standard. The Senate Bill No. 567 amendments add an additional component, changing the framework within which the trial court exercises its discretion by specifying a legislatively determined presumptive sentence. This means we must ask both whether we can be certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term. (*People v. Lopez* (2022) 78 Cal.App.5th 459, 463, 466–467, fns. 10 & 11.)[34]

The trial court here relied upon several aggravating factors. First, the court found Wandrey took advantage of a position of trust and confidence (Cal. Rules of Court, rule 4.421(a)(11)),[35] in that he "conceal[ed] himself as a person who cared for Jane Doe and a father figure and as a person who was in a relationship with Jane Doe's mother for the purposes of allowed continued unsupervised access to Jane Doe at a young and vulnerable age," allowing him to "commit over 100 felony offenses in secret and without resistance from Jane Doe or anyone else that would care for her." Second, the court found the victim was particularly vulnerable (rule 4.421(a)(3)), as she was "only 12 years old when [Wandrey] began to molest her," he was aware

---

[34] *People v. Lopez, supra,* 78 Cal.App.5th 459, disagreed with *People v. Flores, supra,* 75 Cal.App.5th 495, which held that where a defendant is entitled to retroactive application of Senate Bill No. 567, an upper term sentence may be affirmed as long as it can be determined, beyond a reasonable doubt, that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. (*Lopez,* at p. 467, fn. 11; *Flores,* at pp. 500–501.)

[35] Further references to rules will be to the California Rules of Court.

she was "being raised in an already troubled or difficult environment and without adequate adult supervision or care," he was aware she had no father figure and "was at an age and disposition where a person who appeared to fulfill that role would yield enormous influence over her for many years to come," and "because of her young age she was not only powerless to physically repel his assaults, she also lacked the life experience to even know that what the defendant was doing to her was criminal." Third, the court found the manner in which the crimes were committed indicated planning (rule 4.421(a)(8)), in that Wandrey "incorporate[d] sexual molestation into what Jane Doe believed was otherwise normal behavior essentially grooming her to accept his sexual assaults as appropriate conduct allowing him over time to increase the severity of the assaults." The court found these aggravating circumstances "overwhelmingly" outweighed the single mitigating circumstance—no prior criminal record (rule 4.423(b)(1))—which it gave "little to zero weight . . . in light of the sheer number of violent felony convictions" in the present case.

As *Sandoval* cautioned, "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval, supra*, 41 Cal.4th at p. 840.) The aggravating factors the court relied on here are of this nature, requiring "an imprecise quantitative or comparative evaluation of the facts." (*Ibid.*) While it may seem intuitively obvious that Wandrey abused a position of trust, this is less true as to whether Doe was *particularly* vulnerable and whether Wandrey's offenses indicated planning. Some degree of speculation would necessarily be

58

required for us to conclude the jury would have agreed with the trial court's evaluation, or that the trial court would have exercised its sentencing discretion in the same way if it had taken the statutory presumption in favor of the middle term into account.  Mindful of *Sandoval*'s caution, and in order to give Senate Bill No. 567 its full effect, remand for resentencing in light of the amendments to section 1170, subdivision (b), is appropriate.

## DISPOSITION

The matter is remanded for resentencing in light of section 1170, subdivision (b), as amended by Senate Bill No. 567.  In all other respects, the judgment is affirmed.

_____
Mayfield, J.*

We concur:

_____
Richman, Acting P.J.

_____
Stewart, J.

*People v. Wandrey* (A161691)

        * Judge of the Mendocino Superior Court, assigned by the Chief Justice
pursuant to article VI, section 6 of the California Constitution.

Trial Court:                    Sonoma County Superior Court

Trial Judge:                  Hon. Mark Urioste

Attorney for Appellant:      By appointment of the Court of Appeal
under the First District Appellate Project
Dirck Newbury

Attorneys for Respondent:   Rob Bonta
Attorney General of California

Lance E. Winters
Chief Assistant Attorney General

Jeffrey M. Laurence
Senior Assistant Attorney General

Alice B. Lustre
Supervising Deputy Attorney General

J. Michael Chamberlain
Deputy Attorney General